Gibson J.
delivered the opinion of the Court.
The construction attempted to be given to the fifth section of the Act of 28th January, 1777, cannot be sustained. The proprietary estate, previous to the revolution, was undoubtedly their absolute property, and subject to their disposition without the control of the popular branch of the government; but the motive for the act lay. deeper than a mere changé of the form of government. To have suffered the Penn family to retain those rights which they held strictly in their proprietary character, would have been inconsistent with the complete political independence of the State. The province was a fief held immediately from the crown, and the revolution would have operated very inefficiently, towards complete emancipation, if the feudal relation had been suffered *189 to remain. It was therefore necessary to extinguish all foreign interest in the soil, as well as foreign jurisdiction in matters of government. But there was an obvious distinction between what the proprietaries had appropriated to themselves as their private estate, and the mass of unappropriated land which they held only as proprietaries. To the first, they had the same title both legal and equitable, which every other member of the community had to his estate, and at the revolution were, as to those lands, as much within the policy of protection under the distribution of the public lands therefore made, as any other individual: to the second they had only the grant in the charter, which depended for its validity on a connection that had been recently severed. Governor John Penn, who was in Philadelphia at the declaration of independence, must have anticipated the events, which have since taken place ; for although the land office was kept open to the December following, little or nothing was done : and after the passing of the Act in question, it was formally closed and the officers ceased to act. This contemporaneous construction, and submission on the part of Mr. Penn, shew clearly what was meant. ■ But it would, independent of this, take much to shew, after the subsequent Acts of Assembly of the 17th March, 1780, and the decision in Hubley v. Chew, 2 Sm. Laws, 258. 2 Yeates, 133, that all proprietary offices not particularly excepted, were not terminated by this Act. The opinion of the Court in Hubley and Chew, upon the very title now in question, although formed at Nisi Prius, is entitled to every respect that a decision can receive from extraordinary abilities in the counsel who argued, and intimate knowledge of the subject matter in the Judges who decided it. Those Judges were contemporary with the transactions under consideration, and had an intimate knowledge of the customs and history of the land office. 1 he surveys then, having been made in April, 1777, by Joseph Wallis, under Charles Lukens, who had been the deputy surveyor under the proprietary government, were unquestionably without authority and could give no right at the time they were made.
Have they been recognised or acquired validity pursuant to any legislative Act? Under the Act of the 17th March, 1780, they might have acquired validity if they had been returned pursuant to its provision; but that is not pretended. *190 They were actually returned however before the Act of the 5th of April, 1782, the fifth section of which, gave the surveyor general a discretionary power, unlimited in point of time, to act on the subject of receiving surveys made by the late deputy surveyors, under circumstances similar to those which existed in the case before us. The returns had been taken to the office before this Act, but under what circumstances we know not: all that is certain is, that the surveyor general never acted on them, or received them under the Act. By what other laws then, can they have been validated ?
The Act of the 9th of April, 1781, which enables the owners of warrants granted before the 10th of December, 1779, (at which period the officers of the land office, under the proprietaries, entirely ceased to act,) to obtain patents on payment of the purchase money, is said to have been in this particular, a substantial alteration of the. provisions of the Act of the 28th of January, 1777. I cannot perceive it. The divesting Act of the 27th of November, 1779, had validated all grants of the late proprietaries before the 4th of July, 1776, and it was thought proper by the Act of 1781, to extend the time to the 10th of December following; but there is not a word said about unauthorised surveys on any of these rights. If a survey had been made by the proprietary deputy, before the 28th of March, 1777, it might, by the Act of the 4th of September, 1793, be returned by him, provided he were in office under the Commonwealth, at any time within nine years previous to the time of making such return; but this last Act clearly related to surveys before the 28th of March, 1777, when the officers under the proprietary government had authority ; for it is expressly stated that the surveyors must have acted under legal appointments. And in all cases where surveys had not been made by the deputies of the proprietaries, while they continued to act under valid appointments, the owner of the warrant or location might, under the fifth section of the Act of the 9th of April, T/81, obtain an order to the surveyor general to have the survey made under the authority of the Commonwealth. All these laws, taken together, form a,system, by which it was provided that proprietary grants previous to the 10th of December, 1776, should be protected'; and that if surveys on such grants had not been made by the proprietary deputy surveyors, while they *191 bad authority to act, they might nevertheless be made by deputy surveyors acting under the authority of the Commonwealth. But even where surveys were made by the proprietary deputies, after the expiration .of their authority, those surveys might have been rendered valid under certain conditions; which have not however been complied with in the case under consideration, and the surveys must therefore be taken to be void.
It is insisted that granting them to be so, they were still notice of a prior appropriation of the land, so as to prevent án appropriation of the same land by subsequent purchasers ; and that the Court should have so directed the jury, But that would have given to them an operation and qualities, that would result only from a valid and binding appropriation of'the land. Of what could they be notice, but that void surveys had been made, which could affect the rights of no one, and which, therefore, could prevent no one from appropriating the ’ land on a subsequent warrant. The returns could be received, under the laws subsequently enacted, only in case no intervening right had attached.; for those surveys were not to be established to the prejudice of subséquent purchasers, who had appropriated the same land under subsequent surveys, which were lawful when they were made. This is not even as strong as the case of a deed improperly registered, which has been held, not to be constructive notice ; for the existence of such deed is a fact which will always affect the party, where actual notice is brought home to him; but here the very fact of which the survey was said to be constructive notice, was immaterial.
It is objected, that the jury were directed that the defendants having the earliest survey, would have the best title, neither of the warrants being precisely descriptive of the land, but each being descriptive to a common intent. The law is clear' beyond dispute, that in such a case the title can attach only by actual survey. It is also objected that the plaintiff having prayed the Court to direct the jury,'that the tenants in possession, having never, designated their- boundaries as im-. provers, nor claimed’ any definite quantity of. land, would, if protected at all by the Statute of Limitations, be so only for “ the quantity actually enclosed and occupied,” the Court left the facts to the jury with a direction that there must be defi *192 nite boundaries, otherwise the defendants would be confined t0 what they “ actually occupied and this, it is said, was not a direction as favourable as the plaintiff was entitled to have, because it might extend the protection of the Statute to what was not actually enclosed. But actual occupancy means a pedis possessio, which can only be of ground enclosed. The constructive possession supposed to result from defined boundaries had nothing to do with the cause, for there cannot be such thing; but the direction being full as favourable to the plaintiff, as he had desired in his prayer, there is no error of which he can take advantage. The judgment is affirmed.
Judgment affirmed.